UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| DOUBLE H MASONRY, INC., | ) | Case No.: 15-5004 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| v. | ) | |
| | ) | **FILED** |
| LIBERTY MUTUAL INSURANCE COMPANY | ) | |
| and LOCKTON COMPANIES, LLC | ) | JAN 0 9 2015 |
| | ) | |
| Defendants. | ) | CLERK |
| | ) | |
| | ) | |

Double H Masonry, Inc., for its complaint against Liberty Mutual Insurance Company and Lockton Companies, LLC, demands a jury trial, and states and alleges as follows:

JURISDICTION

1.     Double H Masonry, Inc. ("Double H Masonry") is a corporation organized and existing under the laws of South Dakota, and has and at all times material herein had its principal place of business located in Meade County, South Dakota, and has never had a principal place of business outside of the State of South Dakota, and is a citizen of the State of South Dakota.

2.     Liberty Mutual Insurance Company, upon information and belief, is, and at all times material herein was, a corporation organized and existing under the laws of the State of Massachusetts, and has, and at all times material herein had, its principal place of business located at Boston, Massachusetts, and is a citizen of the State of Massachusetts.

3.     Lockton Companies, LLC, upon information and belief, is, and at all times material herein was, a corporation organized and existing under the laws of the State of Missouri, and has, and at all times material herein had, its principal place of business located at St. Louis, Missouri, and is a citizen of the State of Missouri.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the matter in controversy is between parties who are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This court also has jurisdiction pursuant to 28 U.S.C. § 1352.

5.      Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b)(2) and SDCL§ 15-5-1, -4, and -5; by virtue of the terms of the bond itself; because Defendant is subject to personal jurisdiction in this forum based on Defendants purposefully availing itself of the privilege of conducting activities within the State of South Dakota in connection with the tribal project from which this action arose; the events and omissions giving rise to the claim occurred within the district; and the property that is subject to this action is situated within the district.

BACKGROUND

6.      Double H Masonry restates and fully realleges the allegations set forth in the paragraphs set forth above as though fully set forth herein and further states and alleges as follows:

7.      Milender White Construction Company ("Milender White") solicited bids from subcontractors to perform masonry work on the Pine Ridge Justice Center for the owner of the project, the Oglala Sioux Tribe – Department of Public Safety.  The Pine Ridge Justice Center is located on the Oglala Sioux Tribe reservation near Pine Ridge village, South Dakota.

8.      Double H Masonry provided a bid for masonry work for the Pine Ridge Justice Center on or about March 16, 2012.  The bid indicated the cost of work to be performed by unit of measure, and indicated what work and materials the bid excluded.

9.     Milender White directed Double H Masonry to submit a breakdown of the interior masonry walls and entryway materials from the exterior masonry walls and other materials, so that certain exterior work and materials would be listed as an add alternate.

10.    Double H Masonry's breakdown included the cost of interior masonry walls and entryway stone by unit of measure totaling $1,112,550.00, and the cost of exterior masonry walls and block and insulation by unit of measure totaling $1,021,125.00.

11.    Double H Masonry's bid explicitly excluded the costs of rebar materials, heating, sheltering, and caulking.

12.    Milender White accepted Double H Masonry's bid.

13.    Double H Masonry's bid was incorporated into its subcontract with Milender White.

14.    The prime contract between Milender White and the Oglala Sioux Tribe – Department of Public Safety requires payment for contracted and other work.

15.    Milender White obtained a bond for the project, dated May 25, 2012, and signed by Bryan White of Milender White and Mona D. Weaver of Liberty Mutual Insurance Company. Lockton Companies, LLC is also listed as a surety on the payment bond.  Attached hereto is a copy of the payment bond, which is incorporated herein by reference.  All additional references to the surety, the Defendants, or Liberty Mutual herein also include reference to Lockton Companies, LLC by this reference.

16.    The payment bond provides, in part, that Liberty Mutual is bound in the penal sum of $30,466,297.00 to any subcontractor which furnished labor, materials or equipment for use in the performance of the construction contract between the Oglala Sioux Tribe – Department of Public Safety and Milender White.

17.    The payment bond also states that after being provided a written statement of a claim, Liberty Mutual will send an answer to the claimant within 60 days after receipt of the written statement of claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed, and will pay or arrange for payment of any undisputed amounts.

18.    The payment bond also provides that if Liberty Mutual fails to discharge such obligations, it shall indemnify the claimant for the reasonable attorney's fees the claimant incurs thereafter to recover any sums found to be due and owed to the claimant.

19.    The payment bond also requires Milender White and the Oglala Sioux Tribe – Department of Public Safety to promptly furnish a copy of the payment bond upon the request of any person appearing to be a potential beneficiary of the bond.

20.    Double H Masonry made many oral and written requests to Milender White and the Oglala Sioux Tribe -- Department of Public Safety to obtain a copy of the payment bond.  At no time did Milender White respond with a copy of the bond or indicate that Liberty Mutual was the bond company, but rather gave the name of other bonding companies.

**Unpaid Contracted Work – Invoice No.  300**

21.    Although a part of the original plan, most of the project's exterior masonry walls later became an add alternate.   The exterior masonry walls and other items required for masonry exterior are listed under "add alternates" on page 2 of the Task Order, Form No., 703-A, Subcontractor/Vendor Task Order # 111-042-04-010, dated July 10, 2012.  The contract indicates the add alternate work and the price per unit of measurement contracted for that work.

22.    Double H Masonry was told that precast would replace split-face block on the exterior of the building.  Concrete blocks are referred to as "CMU" – concrete masonry unit.

Therefore, Double H Masonry was no longer to install masonry on the exterior of the building, with the exception of the stone on the entryway.

23.    Milender White then directed that one gable (a peaked part of the roof, made of internal and external CMU) be added back to the exterior masonry work. Nick Troudt of Milender White asked Double H Masonry for the cost of regular CMU and colored split-faced CMU for one gable, but did not ask for the cost to include 2-inch rigid insulation.

24.    Under the contracted add alternate price, the regular CMU and split-face CMU for one gable would add back $72,345 to Double H Masonry's contracted work. Therefore Double H provided that figure.

25.    The $72,345 to add back the regular and split-faced CMU was memorialized in Change Order 111-042.04-010.02. The $72,345 did not include the cost of insulation for the gable, at Milender White's request.

26.    After the change order was determined, however, Milender White directed Double H Masonry to install 2-inch rigid insulation after Double H had begun the process of building the gable. Therefore, another change order was necessitated to add cost of insulation. Despite Double H's numerous attempts to obtain such a change order, Milender White continues to neglect the issue.

27.    Milender White never asked Double H for the costs of adding back in the courtyard masonry work or a second gable. Later, however, Milender White ordered Double H to install split-face CMU and 2-inch rigid insulation on courtyard walls and complete a second gable. Therefore, Double H submitted a bill for the courtyard work and second gable, which is work contracted and priced already under the add alternate provision of the Task Order.

28. In reviewing Change Order 111-042.04-010.02, the 2-inch rigid insulation for the gable was not included, nor was the split-face CMU and 2-inch rigid insulation for the courtyard walls or a second gable.

29. For both gables, 3,239 square feet of 2-inch rigid installation was installed, at Milender White's direction, for which Double H has yet to be paid. At the square foot price of $27 as contracted in the add alternate portion of the contract, the gables insulation totals $87,453.00.

30. For the second gable, 1,593 split-faced CMU at $17.50 per unit, totaling $27,877.50 has yet to be paid. Also for the second gable, 1,593 8-inch regular CMU at $12.00 per unit totaling $19,116 has yet to be paid.

31. For the courtyard, 2,257 split-faced CMU (priced per unit) and 2,007 square foot of insulation (priced per square foot) was installed for which Double H Masonry has not been paid. There was a $5 per square foot deduction for using some leftover materials that Double H Masonry had from a previous job. Therefore, the split-faced CMU is $17.50 per square foot instead of $22.50 as originally quoted. Using $17.50 per square foot multiplied by 2,257 split-face CMU equals $39,497.50. The cost of the 2,007 square foot of insulation, at $27 per square foot, for the courtyard totals $54,189.00. Therefore, additional payment is due for the courtyard in the amount of $93,686.50.

32. Combining the yet-unpaid costs of the gables and the courtyard, Double H Masonry is owed $228,133.00.

**Unpaid Change Orders/Extra Work**

33. Despite Milender White's oral agreements to pay all or portions of extra work it directed, and a written agreement to pay some of the extra work or change orders, Milender

White has not paid for the change orders and extra work it directed, indicated below. Milender White has agreed to pay Invoices 284, 290, 308 in writing, agreed verbally to pay Invoices 283, 285, 286, 289, and 303 at the price Double H Masonry invoiced, and agreed to pay in general for work relevant to Invoice 291. Milender White has not made any such payments.

34.     The prime contract requires the owner to pay for such extra work.

35.     Milender White waived any requirements that change orders must be in writing before work was performed or that cost estimates be supplied in a restricted amount of time.

**Invoice No. 298**

36.     Double H installed masonry as indicated in page A2.2 of the original blueprints at grid 6 & N. The plans, however, show that the wall terminates just above the ceiling grid.

37.     Owner's Representative Taum McGinnis as well as Eric Hansen and Adam Dietz of Milender White directed Double H to ignore those plans and build the wall all the way to the concrete roof deck.

38.     This is additional work not contemplated under the plans. Double H Masonry Invoice No. 298 billed $7,500, which is for 625 10-inch CMU at $12 per unit to install the additional work as directed.

39.     The second line item of Invoice no. 298 for $2,280.00 has been paid to Double H Masonry. The remaining $7,500 is still due and owing.

**Invoice No. 283**

40.     In the original drawings, an architect drawing error had an air duct drawn to be in the roof in Public Safety Room 1262.

41.     Double H Masonry was directed to lower the opening so that an "I" beam could be placed across the top of the duct to bear the weight of the precast roof. Milender White

ordered Double H Masonry to remove CMU that Double H Masonry had installed according to the plans. Milender White ordered Double H Masonry to ignore the plans in order to lower the air duct, allowing the air duct to pass under the ceiling.

42.   Milender White then directed Double H Masonry to fill the CMU back in again and add an "I" beam after the air duct opening was lowered.

43.   Double H Masonry completed this extra work the same day.

44.   Adam Dietz and Kelsey Peveril of Milender White agreed Milender White would pay Double H for this extra work.

45.   Double H Masonry invoiced this work for $4,550.

**Invoice No. 284**

46.   In Room 1300, the plans called for 6-inch CMU under the windows to enclose heating units. After the plumbing was installed, there was not enough clearance behind the 6-inch CMU.

47.   Milender White directed Double H Masonry to change the 6-inch CMU to 8-inch CMU to make room for the plumbing pipes.

48.   Adam Dietz and Kelsey Peveril agreed Milender White would pay for the extra cost, and Adam Mack signed an agreement in writing to pay Double H $1,000 for this extra cost.

49.   Double H Masonry has not yet been paid.

**Invoice No. 285**

50.   Milender White directed Double H Masonry to install 8-inch double bull-nosed CMU around steel columns in Rooms 1110A and 1122A, which was not included in the blueprints.

51.     Because Double H was enclosing steel columns, it was very time-consuming to cut out the inner webbing of each and every CMU laid.

52.     This extra work was invoiced per unit.  At $50 per unit and 70 units installed, this invoice totals $3,500.

53.     Kelsey Peveril and Adam Dietz of Milender White both approved this invoice for payment.  Double H has received no such payment.

**Invoice No.  286**

54.     Milender White directed Double H Masonry to install 6-inch double bull-nosed CMU around steel columns in Rooms 1160, which was not included in the blueprints.

55.     Because Double H Masonry was enclosing steel columns, it was very time-consuming to cut out the inner webbing of each and every CMU laid.

56.     This extra work was invoiced per unit.  At $50 per unit and 20 units installed, this invoice totals $1,000.

57.     Kelsey Peveril and Adam Dietz of Milender White both approved this invoice for payment.  Double H has received no such payment.

**Invoice No.  287 (first progress invoice)**

58.     The door frames were not on site at the time Milender White directed Double H to lay up masonry walls.

59.     The specifications, industry standards, and understanding of the parties at the time the bid was accepted and the contracts were signed were that the door frames would be installed before masons laid up the walls around the door frames.

60.     Milender White directed Double H Masonry to grout the door frames after the walls were built rather than grouting them as the walls were being built.

61.     This incurred more cost then contemplated under the specifications and contract.

62.     Double H Masonry billed for this extra work for 160 mason and laborer hours at $125.00 an hour, for a total of $20,000.

63.     In the specifications, Section 04 20 00 Unit Masonry, p. 10, says the masons are to "Fill hollow metal frames with mortar as wall is laid up."

64.     Section 08 11 00 Hollow Metal Doors and Frames, p. 3 says "Install frames as masonry is laid-up."

65.     The Manual for Installation says "build walls to the frame" and "and are to be properly installed as wall is laid up."

66.     Not only was Milender White's requirement contrary to the specifications and installation manual, it is not industry standard for masons to grout door frames after they are installed. Industry standard dictates that masons grout door frames that are already installed, as this takes little time. To ask masons to come back and grout doors later requires drilling holes into the hollow metal door frames and filling them with grout bags instead of by trowel, which requires additional time to complete the task. All these additional measures are unnecessary when the door frames are in place before the masonry wall is laid up, as required by the specifications for the job.

**Invoice No. 305 (second progress invoice)**

67.     The door frames were not on site at the time Milender White required Double H Masonry to lay up masonry walls.

68.     The specifications, industry standards, and understanding of the parties at the time the bid was accepted and the contracts were signed were that the door frames would be installed before masons laid up the walls around the door frames.

69.     Milender White directed Double H Masonry to grout the door frames after the walls were built rather than grouting them as the walls were being built.

70.     This incurred more cost then contemplated under the specifications and contract.

71.     Double H billed this second progress invoice for this extra work for 144 mason and laborer hours at $150.00 an hour, for a total of $21,600.  The rate was increased because the time and labor necessary was greater than determined in the first progress invoice.

72.     In the specifications, Section 04 20 00 Unit Masonry, p. 10, says the masons are to "Fill hollow metal frames with mortar as wall is laid up."

73.     Section 08 11 00 Hollow Metal Doors and Frames, p. 3 says "Install frames as masonry is laid-up."

74.     The Manual for Installation says "build walls to the frame" and "and are to be properly installed as wall is laid up."

75.     Not only was Milender White's requirement contrary to the specifications and installation manual, it is not industry standard for masons to grout door frames after they are installed.  Industry standard dictates that masons grout door frames that are already installed, as this takes little time.  To ask masons to come back and grout doors later requires drilling holes into the hollow metal door frames and filling them with grout bags instead of by trowel, which requires additional time to complete the task.  All these additional measures are unnecessary when the door frames are in place before the masonry wall is laid up, as required by the specifications for this job.

**Invoice No.  302 (Bates 148)**

76.     As indicated above, Milender White did not have the door frames on site at the time it required Double H to build masonry walls.

77.     Eric Hanson of Milender White explicitly stated to Double H Masonry that Milender White would pay for Double H Masonry to build and install door bucks.

78.     Door bucks act as temporary door frames, so that masons can lay up a wall around where the door will eventually go.  The door bucks must be built, installed, then torn out after the wall is built.  Then actual door frames must be installed, and only then can the door frames be grouted, requiring much more time and effort.

79.     Milender White also directed Double H Masonry to unload door trucks and install door frames, claiming it was required in Double H Masonry's contract.

80.     There are no requirements to unload door trucks or install door frames in Double H Masonry's contract.

81.     Double H invoiced such extra work for building door bucks, unloading door trucks, and door installation. Double H invoiced for 200 doors at $300 per door, which was an amount that is standard in the industry comparable to what door installers charge for such work. The total of this invoice is $60,000.

82.     Despite Eric Hanson's verbal statements contrary, Milender White has insisted that building, installing, and removing door bucks are a part of Double H Masonry's contract.

83.     Milender White also claims that unloading doors and installing door frames are required by Double H's contract.

84.     Double H's Task Order, Attachment B 2.20, requires "Grouting of all hollow metal and detention doors set in CMU or precast walls."  Grouting means filling grout in the hollow metal door jams according to the door installation manual and the specifications. Grouting doors does not mean unloading doors, installing doors, or building door bucks.

-12-

**Invoice No. 288**

85.     Some of the door frames came with damage.   The subcontractor who hung the doors straightened them out, and they were approved by Eric Hanson of Milender White to be installed.

86.     Double H Masonry installed these door frames as directed by Milender White. Later, the architect required those door frames to be torn out.  Therefore, those door frames had to be removed, re-ordered, and re-installed.

87.     Double H Masonry was not required by the contract to install any door frames. Neither did the contract require Double H to tear out and then re-install new door frames.  Such is extra work, was guaranteed to be paid by Eric Hanson of Milender White, and has yet to be paid.

88.     Double H invoiced 40 mason and laborer hours at $125 an hour for a total of $5,000 for this extra work.

**Invoice No. 289**

89.     The window frames were not on site at the time Milender White required Double H Masonry to lay up masonry walls.

90.     The specifications, industry standards, and understanding of the parties at the time the bid was accepted and the contracts were signed were that the window frames would be installed before masons laid up the walls around the window frames.

91.     Double H Masonry was directed to grout the window frames after the walls were built rather than grouting them as the walls were being built.

92.     This incurred more cost then contemplated under the specifications and contract.

93.     Double H billed this invoice for this extra work for 30 mason and laborer hours at $125.00 an hour, for a total of $3,750.

94.     In the specifications, Section 04 20 00 Unit Masonry, p. 10, says the masons are to "Fill hollow metal frames with mortar as wall is laid up."

95.     Section 08 11 00 Hollow Metal Doors and Frames, p. 3 says "Install frames as masonry is laid-up."

96.     The Manual for Installation says "build walls to the frame" and "and are to be properly installed as wall is laid up."

97.     Not only was Milender White's requirement contrary to the specifications and installation manual, it is not industry standard for masons to grout window frames after they are installed. Industry standard dictates that masons grout window frames that are already installed, as this takes little time. To ask masons to come back and grout window frames later requires drilling holes into the hollow metal window frames and filling them with grout bags, which cannot be done by trowel, and takes a huge amount of time. All these additional measures are unnecessary when the window frames are in place before the masonry wall is laid up, as required by the specification for the job.

98.     Adam Dietz of Milender White agreed this work should be paid, yet Double H has yet to be paid for this work.

**Invoice No.  290**

99.     Well after construction began, Milender White and Double H Masonry found and brought a design flaw to the architect's attention in order for it to be changed. The architect changed a design which added labor on the gable ends of the roof. The architect changed the attachment of the angle iron that would bear the weight of the CMU.

-14-

100.    This added extra work was not included in the blueprints in existence at the time the job was bid.

101.    Adam Dietz first indicated that Milender White would pay Double H Masonry for this additional cost.  Later, Adam Dietz stated that Milender White and Double H should split the costs.

102.    Double H Masonry has not yet been paid.

**Invoice No. 291**

103.    The Task Order, Attachment B, "Scope Exclusions" says "Weather Protection (By Others) is excluded under the mason's scope."

104.    Double H Masonry's bid which was accepted also excluded weather protection.

105.    Weather protection includes sheltering and covering construction work.

106.    Milender White attempted to use another subcontractor's contract to convince Double H Masonry and the Oglala Sioux Tribe - Department of Public Safety that Double H Masonry was required to provide weather protection.  Milender White's Issue No. 000-291 (Double H Invoice No. 291), attached to attachment B (third page in) is a portion of the precast subcontractor's contract and not Double H Masonry's contract.  The first paragraph clearly shows that it is for structural precast concrete and not masonry.  It is very different from the attachment B, of the same date (May 22, 2012).  The page of the precast contract is not a part of the contract sent to and signed by Double H Masonry, as reflected in an email dated March 28, 2014 with Double H Masonry's contract attached.

107.    In Double H Masonry's contract, 1.3 states "Weather Protection (by others)" is a scope exclusion.  In the precast attachment B, there are no sections 1.3 or 1.4.  On page 2, the precast contract stops with section 2.22, whereas Double H's masonry attachment B proceeds

through section 2.29.  In the precast contract, 2.20 states "provide temporary heating and weather protection for grout as required within the above noted drawings and specifications, including additives to grout mixture if required."  In the masonry contract, no such provision exists. Instead, in the masonry contract, it states "2.2 grouting of all hollow metal and detention doors set in CMU or precast walls."  Double H's contract requires nothing for weather protection and explicitly excludes it in 1.3.

108.    While the specifications regarding 3.4 entitled "Cold Weather Requirements" give temperature guidelines, the specifications do not specify who builds the shelters.

109.    Eric Hanson of Milender White specifically told Double H Masonry that Milender White understood it would need to pay Double H Masonry to build and equip such shelters and cover walls with heat blankets.

110.    Eric Hanson stated that Double H Masonry should provide the sheltering and blankets and keep track of their time and submit it for payment later.

111.    Adam Dietz of Milender White agreed that Milender White owes for sheltering, yet Milender White has not paid this invoice or any portion of it.

112.    Double H Masonry invoiced for sheltering by man hours at $50 an hour for 509 laborer hours.  Double H invoiced for covering and uncovering walls with heat blankets at $125 an hour for 82 mason and laborer hours.  The total is $35,700.00.

**Invoice No.  299**

113.    Milender White has withheld 5% of Double H Masonry's work paid thus far. Therefore, Milender White still owes Double H Masonry $58,300.95 in retainage.

**Invoice No. 301**

114.    The prime contract between the owner Oglala Sioux Tribe - Department of Public Safety and Milender White requires the Department of Public Safety to pay for all materials incorporated in the work.  Section 8.1; 8.2.5.

115.    It is industry standard and normal practice that an owner must pay for the materials used for its building project.

116.    The Pine Ridge Justice Center has $99,000 worth of steel rebar within its structure, purchased by Double H Masonry and accepted by Milender White, which has never been reimbursed to Double H Masonry.

117.    Double H Masonry's bid explicitly excluded rebar.

118.    Milender White and Oglala Sioux Tribe - Department of Public Safety accepted Double H's bid.

119.    The bid totals the amounts on page 2 of the Task Order, which is $2,133,675.

120.    The bid was incorporated into the contract.

121.    All parties understood that rebar was excluded from the bid price.

122.    Task Order Attachment E lists all of Double H Masonry's material men, and no steel provider is listed.

123.    The Task Order, page 1, states that the mason's scope of work is listed in the sections noted, which do not say who must pay for the rebar.

124.    Double H's Task Order states Double H is to "furnish and install masonry work."

125.    "Furnish" does not mean the same as "pay for".  Contracts state "furnish, pay for, and install" when a subcontractor is required to do all three.

126.    It is not industry standard to require masons to pay for or even provide rebar. Even if the contract states that a masonry must furnish labor and materials, rebar is excluded from that, as is industry standard.

127.    In the alternative, if the contracts at issue are capable of more than one meaning or may be understood in more than one way with regard to who must pay for rebar materials, the contract language is ambiguous and must be strictly construed against the author of the contract, which is Milender White.

128.    Milender White has been unjustly enriched by Double H Masonry, and Double H Masonry will be unjustly penalized if Milender White was permitted to retain the benefits of the rebar materials without paying for them.

129.    Milender White has been unjustly enriched with $99,000 worth of rebar which was excluded under Double H Masonry's bid, a term Oglala Sioux Tribe - Department of Public Safety and Milender White accepted.  The owner explicitly agreed to pay for all materials, yet Double H Masonry has not been paid for the rebar materials.

130.    Double H's invoice was figured using 165,000 pounds of rebar at $.60 per pound. The total is $99,000 for all rebar that is now a part of the Justice Center structure.  This does not include installation of the rebar, only the cost of the rebar materials.

**Invoice No. 303**

131.    In the original drawings, an architect drawing error had an air duct drawn to be in the roof in Corridor 1309B.

132.    Milender White ordered Double H Masonry to remove CMU that Double H had installed according the plans.  Milender White ordered Double H to ignore the plans in order to lower the air duct, allowing the air duct to pass under the ceiling.

133.   Milender White then directed Double H to fill the CMU back in again after the air duct opening was lowered.  Double H completed this extra work the same day.

134.   Adam Dietz and Kelsey Peveril of Milender White agreed Milender White would pay Double H for that extra work.

135.   Double H Masonry invoiced $3,000 for such work, but has yet to be paid.

**Invoice No.  308**

136.   An amount was incorrectly removed from Double H Masonry's contract.  $2,116 was incorrectly removed due to Milender White's mistake in Change Order # 11, which Milender White later agreed to correct.

137.   Double H has received no such payment.

**Invoice No.  309**

138.   An employee of Double H Masonry fell through a hole in a roof due to Milender White failing to cover and barricade the hole.

139.   Milender White is required to cover such holes and barricade them both as the general contractor and under its contract.

140.   Double H Masonry was OSHA-compliant prior to beginning work on the project.

141.   Milender White forced Double H Masonry employees to take a safety training class, for which each Double H employee was already certified.

142.   A safety course was available in Rapid City for $50, and was available within 2 days.

143.   Milender White instead required Double H Masonry employees to be trained on-site in Pine Ridge by a far more expensive company, which incurred a bill from the safety trainer for $1,064.

144.   Milender White forced Double H to pay this cost by holding all of Double H Masonry's progress payments until Double H paid this bill under duress.

145.   Double H Masonry is due $1,064, as Milender White wrongfully required such expense of Double H Masonry, and withheld progress payments from Double H Masonry until it agreed to pay the bill.

146.   As explained more fully below, the Oglala Sioux Tribal Employment Rights Commission determined that the $1,064 must be paid by Milender White to Double H Masonry. Therefore, this amount is included in the TERO amount below.

**Unpaid TERO award**

147.   Double H Masonry was one of six subcontractors and two employees of Milender White which filed discrimination and retaliation complaints against Milender White with the Oglala Sioux Tribal Employment Rights Office (TERO).

148.   The Pine Ridge Justice Center was built on the Oglala Sioux Reservation, and as such is subject to the law of the land as established by the Oglala Sioux Tribe.

149.   The Oglala Sioux TERO Commission is much like the state Department of Labor or the federal Equal Employment Opportunities Commission.  The TERO office receives and rules on complaints for discrimination, retaliation, Indian preference issues, and such civil rights to ensure that they are followed on the Oglala Sioux Reservation.

150.   The TERO Commission held three hearings and received stacks of evidence regarding Milender White's conduct on the Pine Ridge Justice Center project.

151.   After much testimony was taken, hundreds of documents were received into evidence, and deliberation, the TERO Commission issued its decision on February 12, 2014.

152.   The TERO Commission specifically found that "Double H Masonry was subject to treatment that appeared to be retaliatory for their support of Murdock Electric's complaints that resulted in their falling behind schedule and having to do excessive work beyond the scope of their contract."

153.   The TERO Commission ruled that Double H Masonry was "singled out for disparate treatment by Milender White employees on the job site due to their support for Murdock Electric and Murdock Electric's complaints."

154.   The TERO Commission found that Double H's employees were made to constantly move their scaffolding and equipment around the job only after Double H Masonry's support for Murdock Electric became public knowledge on the job site.

155.   The TERO Commission found that forcing Double H Masonry employees to constantly move scaffolding and equipment "resulted in trade stacking and unreasonable delay that appeared to be retaliatory in nature."

156.   TERO Commission awarded Double H Masonry $1,520 for the cost of a safety class and damages in the amount of $291,666.66.

157.   Because Milender White was not meeting with subcontractors and standing subcontractors up at meetings to discuss change order and payment issues, the TERO Commission ordered that Milender White meet with subcontractors within ten business days and provide a report to the TERO Commission.

158.   Milender White then sued the Oglala Sioux Tribe, individuals on the TERO Commission, and the TERO director, and attempted to appeal the TERO decision.

159.   The Oglala Sioux Tribe has moved to dismiss the claim against it in tribal court for lack of jurisdiction. As to the appeal, the Oglala Sioux Tribe asked the tribal court to order a

bond requiring Milender White to put money up as security to cover the TERO awards should the TERO awards or any portion thereof be upheld on appeal.

160.    On March 31, 2014, the tribal court ordered that Milender White put $500,000 up in a bond, to be filed with the tribal court no later than April 14, 2014.

161.    Milender White failed to put up any bond with the tribal court.

162.    Instead, Milender White filed a motion to reconsider. Therefore, Milender White flouted the order of the tribal court, the deadline imposed, and the requirement of putting $500,000 up in a bond pending the appeal. The tribe is waiting for the Court's order regarding that issue.

163.    On April 8, 2014, Milender White made a claim against the Oglala Sioux Tribe-Department of Public Safety as CE # 106 in the amount of $2,164,388.00.

164.    A letter from Milender White to the Oglala Sioux Tribe – Department of Public Safety described as a "CE # 106 Narrative" explains CE # 106 and its $2,164,388.00 claim. "Corrected exhibits" were attached to that letter submitted to the Department of Public Safety by hand-delivery.

165.    Upon information and belief, these hand-delivered "corrected exhibits" include Double H Masonry's add alternate invoice and some extra work invoices, as well as other subcontractors' invoices yet unpaid.

166.    Milender White's claim against Oglala Sioux Tribe - Department of Public Safety included $917,266 for "extended general conditions cost", $123,034 for "cost of work damages", $360,440 in "legal cost", and $763,648 for "liability for TERO Ruling", totaling $2,164,388.00.

167.    The Narrative indicates that the delay portion of the claim constitutes $1.4 million, and the "cost of work" component of damages is a reflection of pending yet unresolved subcontractor claims.

168.    Nearly all of Double H Masonry's invoices were submitted in October and November of 2013 and all invoices were submitted prior to the date of the Narrative.

169.    Oglala Sioux Tribe - Department of Public Safety settled this claim with Milender White for a total of $1.1 million.

170.    The cover letter from Oglala Sioux Tribe - Department of Public Safety, dated May 28, 2014, indicates that Milender White "will modify CE # 106 to $1.1 million which includes all claims for costs related to: delays caused by the November 2013 shutdown; MWCC vs. TERO dispute settlement; and unresolved change orders as listed in CE # 106." The letter also states that "MWCC will bear the risk (beyond the $1.1 million addressed above) to pay, settle and/or otherwise resolve all payment disputes with subcontractors."

171.    Oglala Sioux Tribe - Department of Public Safety has already paid Milender White $1.1 million to pay Double H Masonry its TERO award and invoices. Despite Milender White receiving such money, it has paid Double H Masonry none of it.

172.    Oglala Sioux Tribe - Department of Public Safety withheld $400,000 of the balance of the funds otherwise to be paid to Milender White which will remain in an escrow account pending the Oglala Sioux TERO's final determination.

173.    While that $400,000 sits in an escrow account, it has not been disbursed to pay any of the entities such as Double H Masonry who were given TERO awards, or to satisfy the tribal court-ordered bond.

174.    Upon information and belief, Milender White is using the $400,000 escrow money to pay its own attorneys' fees to litigate its lawsuit against the Oglala Sioux TERO Commission, members, and director in tribal court.

175.    Double H Masonry is owed a total of $293,186.66 from Milender White pursuant to the TERO award dated February 12, 2014, plus interest.

176.    The payment bond is liable to cover claims related to the prime contract between Milender White and Oglala Sioux Tribe – Department of Public Safety.

177.    By Milender White's own admissions and arguments, sections 6.3.1, 6.3.3, and 7.4.2 of the prime contract cover Milender White's claim against the Oglala Sioux Tribe – Department of Public Safety for Milender White's alleged "governmental interference" and "adverse governmental actions" at the hand of both the Oglala Sioux TERO Commission and the Oglala Sioux Tribe Economic and Business Development Committee.  Such alleged "governmental interference" and "adverse governmental actions" was the basis for Milender White's CE # 106, claiming $2,164,388.00 against the tribe, for which Milender White settled for $1,100,000.00.

178.    In its claim against the tribe, Milender White asserted that the Oglala Sioux TERO ruling is an "unauthorized change order to subcontractors ordered by TERO."  Therefore, the $1.1 million settlement Milender White received from the Oglala Sioux Tribe – Department of Public Safety was a payment by the owner to Milender White to cover the "change order to subcontractors" which Milender White has never paid to Double H Masonry.

### Count I – Breach of Payment Bond

179.    Double H Masonry restates and realleges the allegations set forth in the paragraphs above as though fully set forth herein and further states and alleges as follows:

180.     Milender White obtained the payment bond for the project from Liberty Mutual Insurance Company.

181.     Pursuant to the payment bond, Liberty Mutual is bound in the penal sum of $30,466,297.00 to Double H Masonry for the payment of labor, services, supplies, and materials provided directly or indirectly towards the performance of the project.

182.     Milender White and Oglala Sioux Tribe - Department of Public Safety breached Section 15 of the payment bond, requiring them to promptly furnish a copy of the payment bond after Double H requested it.

183.     On November 26, 2014, Double H Masonry provided Liberty Mutual, Milender White, and Oglala Sioux Tribe - Department of Public Safety with notice of its claim on the payment bond.

184.     Pursuant to the subcontract, Milender White agreed to pay Double H Masonry for its work on the project at the prices set forth in the subcontract.

185.     Pursuant to oral contracts, written agreements, and change orders, Milender White agreed to pay Double H Masonry for the extra work Milender White directed on the project.

186.     Pursuant to the prime contract, Oglala Sioux Tribe - Department of Public Safety agreed to pay for all materials for the project.

187.     Milender White and Oglala Sioux Tribe - Department of Public Safety breached their respective contracts by failing to pay Double H Masonry for all the work performed and materials provided on the project.

188.     Pursuant to statutory and common law, Double H Masonry is entitled to interest for its unpaid work and materials.

-25-

189.    Double H Masonry must be paid for its work and materials by virtue of quantum meruit and unjust enrichment law.

190.    Double H Masonry conferred the benefits of labor and materials to Milender White.  Milender White accepted or acquiesced to those benefits, and it is inequitable to receive that benefit without paying.

191.    Double H Masonry furnished labor and purchased materials to Milender White which were knowingly and voluntarily accepted.  It is inferred that such labor and materials were given and received in the expectation of being paid for and a promise to pay their reasonable worth is implied.

192.    Although requested, Liberty Mutual has yet to pay anything pursuant to Double H Masonry's claim.

193.    As a result of Defendant's breach of the payment bond, Double H Masonry has been damaged in the amount of $848,755.61, plus prejudgment interest at 10% beginning the date of each invoice or order.  SDCL § 21-1-13.1, § 54-3-5, -16.

WHEREFORE, Plaintiff Double H Masonry, Inc. seeks the following from the Court:

1. Judgment against Liberty Mutual Insurance Company and in favor of Double H Masonry, Inc. for monetary damages in the amount of $848,755.61;

2. Prejudgment interest, costs and disbursements;

3. Double H Masonry's attorneys' fees and costs; and

4. For such other further relief as the Courts deems just and equitable.

JURY TRIAL DEMANDED.

Dated:  January 9, 2015.

GUNDERSON, PALMER, NELSON
& ASHMORE, LLP

By:_____
Sara Frankenstein
Jason M. Smiley
Attorneys for Plaintiff
506 Sixth Street
P.O. Box 8045
Rapid City, SD  57709
Telephone: (605) 342-1078
Telefax:  (605) 342-0480
E-mail:  sfrankenstein@gpnalaw.com