

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

*****************************************************************

| | | |
|---|---|---|
| DOUBLE H MASONRY, INC | * | |
| | * | |
| Plaintiff, | * | CIV 15-5004 |
| | * | |
| | * | |
| v | * | |
| | * | MEMORANDUM OPINION AND ORDER |
| | * | |
| | * | |
| LIBERTY MUTUAL INSURANCE | * | |
| COMPANY | * | |
| | * | |
| Defendant | * | |
| | * | |
| | * | |

*****************************************************************

Before the Court is Defendant's Motion to Dismiss Count II of Plaintiff's Second Amended Complaint pursuant to FED R CIV P 12(b)(6) failure to state a claim for which relief can be granted   Defendant initially filed a Motion to Dismiss Counts II and III of Plaintiff's Amended Complaint   Doc 32   Plaintiff filed a Response to Motion to Dismiss[1]   Doc 34 Defendant filed a Reply to Plaintiff's Response   Doc 39   Plaintiff then moved to amend its amended complaint   Doc 59   This Court granted Plaintiff's motion to amend and ordered Plaintiff to serve the Second Amended Complaint as proposed   Doc 60   Plaintiff's Second Amended Complaint contains only Counts I and II   Doc 61   The parties then stipulated that the facts and law contained in Docs 32, 34, and 39 applied to the allegations contained in Count II of Plaintiff's Second Amended Complaint and that briefing was complete   Doc 63   The Court has considered all filings and for the reasons set forth below, Defendant's motion is denied in part and granted in part

---

[1] LR 7 1(B)(1) limits briefs to 25 pages unless prior approval has been obtained with the Court   Plaintiff's response was 39 pages and Plaintiff did not obtain prior approval with this Court to file a brief in excess of the 25 page limit

## BACKGROUND

Milender White Construction Company ("Milender White") is a general building construction contractor and Double H Masonry, Inc ("Double H") is a masonry subcontractor Liberty Mutual Insurance Company ("Liberty Mutual") is the bonding company for Milender White

Milender White entered in a construction contract with the Oglala Sioux Tribe – Department of Public Safety ("the Tribe") for construction of the Pine Ridge Justice Center (the "Project") located on the Pine Ridge reservation in South Dakota  In March of 2012, Double H submitted a bid for masonry work on the Project  This bid included $1,112,500 00 for the cost of interior masonry walls and entryway stone by unit of measure, and $1,021,125 00 for the cost of exterior masonry walls and block and insulation by unit of measure  Double H's bid expressly excluded the costs of rebar materials, heating, sheltering, and caulking  Milender White and the Tribe accepted Double H's bid and it was incorporated into the subcontract  In May of 2012, Milender White obtained a payment bond for the Project through Liberty Mutual for the sum of $30,466,297 00  The general purpose of the payment bond was to guarantee that Milender White would pay its subcontractors all amounts due and owing for labor and materials [2]  The payment bond also stated that after being provided a written notice of a claim, Liberty Mutual will "[s]end an answer to the Claimant        within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed,[3] and Pay or arrange for payment of any undisputed amounts "[4]

Under the terms of the subcontract, Double H commenced work on the Project  Pursuant to the prime contract, the Tribe agreed to pay for all materials for the project  Further, pursuant to various oral contracts, written agreements, and change orders, Milender White also agreed to pay Double H for additional work on the Project  In November of 2013, conflicts arose between Double H and Milender White and the Tribe regarding Double H's entitlement to payments for work performed and material provided on the Project  On November 26, 2014, Double H

---

[2] Payment Bond § 1, Doc 61-1
    The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by references subject to the following terms
[3] *Id* § 7 1
[4] *Id* § 7 2

provided Liberty Mutual, Milender White, and the Tribe with notice of its claim on the payment bond   Pursuant to Section 7 1 of the payment bond, Liberty Mutual had sixty days in which to respond to Double H's notice of claim   On January 9, 2015,[5] Double H filed suit against Liberty Mutual for breach of the bond   Doc 1   On January 26, 2015—sixty days after Double H filed its notice of claim—no employee of Liberty Mutual had responded to the notice of claim indicating the amounts that were undisputed and the basis for challenging any amounts that were disputed [6]

On February 20, 2015, Liberty Mutual filed a Motion to Stay Pending Arbitration between Double H and Milender White   Doc 14   On May 26, 2015, Double H filed an amended complaint adding Count II – Contractual and/or Tortious Bad Faith and Count III – Violation of Unfair Trades Practices Act (SDCL §§ 58-33-67, -46 1)   Doc 29 at 32-34   In Count II, Double H alleged that Liberty Mutual owed Double H a duty of good faith and fair dealing and that this duty was violated when Liberty Mutual failed to send an answer to Double H within sixty days after it received Double H's notice of claim, failed to independently and reasonably investigate Double H's claims, failed to pay for five undisputed claims, and filed a motion to stay this litigation   *Id*  at ¶¶ 243-45, ¶ 249, ¶¶ 252-53, ¶ 255

On June 9, 2015, Liberty Mutual filed this Motion to Dismiss [7]   Doc 32   On July 28, 2015, this Court heard oral argument regarding the Motion to Stay   On November 4, 2015, this Court issued a five-page Memorandum Opinion and Order granting Liberty Mutual's Motion to Stay the proceedings between Double H and Liberty Mutual and ordered that it would subsequently rule on the present Motion to Dismiss Count II of the Second Amended Complaint   Doc 75

---

[5] Double H filed suit forty-four (44) days after providing Liberty Mutual its notice of claim
[6] The only response Double H received to its notice of claim on the Liberty Mutual bond was a February 4, 2015 letter from a Milender White attorney   The letter indicated that five claims for payment were undisputed, however, the letter conditioned payment of those five claims on Double H's agreement to deductions in pay, to complete additional work for no pay, to agree to less payment than agreed for one invoice, and to agree to no payment for two other invoices
[7] Double H's amended complaint also contained Count III – Violation of Unfair Trade Practices Act (SDCL §§ 58-33-67, -46 1)   On October 8, 2015, after briefing was completed on Liberty Mutual's Motion to Dismiss Counts II and III of Amended Complaint, *see* Docs 32, 34, and 39, Double H filed a Second Amended Complaint which disposed of Count III   On October 21, 2015, the parties stipulated that the facts and law contained in Docs 32, 34, and 39 applied to the allegations contained in the present Motion to Dismiss Count II of the Second Amended Complaint

DISCUSSION

Liberty Mutual maintains that pursuant to Federal Rule of Civil Procedure 12(b)(6) this Court must dismiss Count II because it fails to state a legally sufficient cause of action, namely that no cause of action exists in South Dakota for a bad faith claim against a surety  While South Dakota law recognizes a bad faith cause of action in the insurance context, it has not been determined whether a surety bond is also subject to a bad faith cause of action  "When there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the [same issue] "  *Cotton v  Commodore Express, Inc*, 459 F 3d 862, 864 (8th Cir  2006)

Standard of Review

In considering a motion under Rule 12(b)(6), the factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable      "  *Bell Atlantic Corp  v  Twombly*, 550 U S  544, 556 (2007), *cited with approval in Data Mfg, Inc  v  United Parcel Serv, Inc*, 557 F 3d 849, 851 (8th Cir  2009)  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[ ]"  *Twombly*, 550 U S  at 555 (internal citations omitted)  The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief  *Id* (internal citations omitted), *see also Benton v  Merrill Lynch & Co, Inc*, 524 F 3d 866, 870 (8th Cir  2008)

Although a plaintiff, in defending a motion under Rule 12(b)(6), need not provide specific facts in support of its allegations, Rule 8(a)(2) "still requires a 'showing,' rather than a blanket assertion, of entitlement to relief"  *Twombly*, 550 U S  at 555 n 3 (further explaining that "[w]ithout some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests "), *see also Ashcroft v  Iqbal*, 556 U S  662, 678 (2009) ("the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation ")  As such, a claim must

have facial plausibility to survive a motion to dismiss  *Ashcroft*, 556 U S  at 678   Determining whether a claim has facial plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense " *Id*  at 679

Bad Faith Cause of Action in Insurance Law

South Dakota law has developed a bad faith cause of action most notably in the insurance context  *Stene v  State Farm Mutual Auto Ins  Co* , 1998 SD 95, ¶ 19, 583 N W 2d 399, 403 (noting that "[a] cause of action against an insurance company for bad faith failure to pay a claim is recognized in *South Dakota Matter of Cert  of a Question of Law*, 399 N W 2d 320, 322 (S D 1987) ")  "The bad faith causes of action have been created and defined by the courts in South Dakota, without nurturing (or impediment) by the South Dakota legislature     "  Roger M Baron, *When Insurance Companies Do Bad Things  The Evolution of the "Bad Faith" Causes of Action in South Dakota*, 44 S D  L  REV  471, 471-72 (1998-1999), *see also Trouten v  Heritage Mut  Ins  Co* , 2001 SD 106, ¶ 30, 632 N W 2d 856, 862 (explaining that "[t]h[e] implied covenant of good faith is a principle of contract law and, *with the exception of insurance contracts*, we have consistently refused to recognize an independent tort action for its breach ") (emphasis added)   Litigation of bad faith claims can be presented in either a first or third-party bad faith context [8]  *Hein v  Acuity*, 2007 SD 40, ¶ 9, 731 N W 2d 231, 235

A first party bad faith claim is essentially an intentional tort and occurs when an insurance company engages in wrongdoing during the process of paying a claim to its insured  *Id*  (citing *Gruenberg v  Aetna Ins  Co* , 510 P 2d 1032, 1036 (Cal  1973)) [9]  In order to prove a first-party bad faith claim, an insured must show "an absence of a reasonable basis for denial of policy benefits *and* the knowledge or reckless disregard of a reasonable basis for denial     " *Matter of Certification of a Question of Law* , 399 N W 2d 320, 324 (S D  1987), *see also Hein*, 2007 SD 40, ¶ 9, 731 N W 2d at 235 (explaining that "an insurer is permitted to challenge claims that are fairly debatable[,] [h]owever, a frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith ")

---

[8] For purposes of this motion, only first party bad faith will be addressed
[9] California was the first state to recognize the tort of bad faith in the first-party context   Several states followed suit, including South Dakota

Both parties agree that in the insurance context, a cause of action for bad faith exists under current South Dakota law  Doc 32 at 7 ("South Dakota allows a cause of action against an insurance company for bad faith failure to pay an insurance claim "), Doc 34 at 11-35 (arguing that a surety bond is insurance under South Dakota Law and a surety can therefore be sued under a bad faith action)  The issue now before this Court is whether a surety bond is a type of insurance and thus subject to a bad faith cause of action  As detailed by the parties' briefs, several jurisdictions have addressed the issue, however, it is one of first impression in South Dakota

Jurisdictions Not Recognizing a Bad Faith Claim in a Surety Context

*California*

In its initial brief, Liberty Mutual argues that "suretyship is essentially credit and not insurance    " and therefore South Dakota should not recognize a bad faith cause of action  Doc 32 at 9  In defense of its position, Liberty Mutual cites almost exclusively to the California Supreme Court case of *Cates Constr , Inc  v  Talbot Partners*, 21 Cal 4th 28 (Cal 1999)  In *Cates*, Talbot Partners ("Talbot") hired Cates Construction, Inc  ("Cates") to build a condominium and Transamerica Insurance Company ("Transamerica") issued the bond on Cates' behalf  *Id* at 35  Conflicts arose between the parties and Talbot demanded that Transamerica perform under the bond  *Id* at 35-36  Citing the existence of a legitimate dispute between Cates and Talbot, Transamerica refused to pay the claim  *Id* at 36  Thereinafter, a lawsuit between all parties ensued  *Id*  Included in Talbot's suit against Transamerica was a tort claim for breach of the implied covenant of good faith and fair dealing under the performance bond  *Id*  At trial, a jury found Transamerica liable for the breach and awarded Talbot $28 million in punitive damages  *Id* at 38  The court of appeals reduced the amount of punitive damages to $15 million, but affirmed the judgment in all other respects  *Id*  Transamerica appealed  *Id*

On appeal, the California Supreme Court reversed and found that "[a] construction performance bond is not an insurance policy[,]" and thus an extra-judicial remedy in tort is unavailable in the surety context  *Id* at 60-61  In refusing to extend a tort recovery, the court found that "whatever benefits might accrue from permitting such remedies, harmful economic results appear at least as likely to occur " *Id* at 58  The court noted that,

6

Unlike insurance relationships, which involve the interests of only two parties, the surety relationship is a tripartite one implicating the separate legal interests of the principal, the obligee and the surety   When contract disputes arise between an obligee and a principal as to whether the principal is in default, it may prove difficult for the surety to determine which party is in the right and whether its own performance is due under the bond

[C]onstruction disputes may be complicated enough to resolve when all three parties are on a level playing field   But it is rational to assume that making tort remedies available may encourage obligees to allege a principal's default more readily than they would in the absence of such remedies   It is also reasonable to conclude that allowing obligees to wield the club of tort and punitive damages may make it easier to pressure sureties into paying questionable default claims, or paying more on properly disputed claims, because the sureties will be reluctant to risk the outcome of a tort action

With such increased leverage, obligees will have sufficient power to detrimentally affect the interests of principals when disagreements arise during construction   Claims of default by the obligee may impair the principal's ability to secure bonding on other projects, thus automatically disqualifying the principal from bidding on all public projects and many private ones   Moreover, indemnity agreements executed by principals often give sureties the right to pursue them for reimbursement of any loss, including legal expenses and the costs of investigation   In efforts to avoid bad faith liability, sureties may strive to "find" bond coverage for obligees while, at the same time, charging their investigation costs to the principal   Accordingly, even if the surety's investigation ultimately leads to the conclusion that the principal is not in default, the faultless principal may still suffer adverse consequences   These considerations, which have no parallel in disputes involving insurance policies, weigh against the recognition of extracontractual liability in the performance bond context

Finally, allowing tort recovery in the construction bond context may open the door to increased (and sometimes successive) litigation, which in turn may increase the cost of obtaining bonds

*Id*  at 58-59 (citations omitted)

In further defense of its holding, the court first noted that California law recognizes tort remedies for breach of the covenant of good faith and fair dealing in the insurer/insured context based on the nature of insurance policies   *Id*  at 44   In particular, the court found that the existence of unequal bargaining power, public interest, the fiduciary relationship between the contracting parties, and the inability of an insured to obtain other recourse in the marketplace provided the basis for allowing this additional remedy in tort   *Id*   In addressing these policy

concerns, the court first distinguished insureds, "who must accept insurance on a 'take-it-or-leave-it'" basis, from obligees, who "decide the form of the bond which they will accept from the principal[,]" and concluded that "a typical performance bond bears no indicia of adhesion or disparate bargaining power that might support tort recovery by an obligee." *Id* at 52-53. Next, the court distinguished the purposes of insurance and surety in that insurance is purchased to protect against unforeseeable losses or catastrophes, whereas a surety more closely resembles a credit arrangement so as to guarantee payment in the event of default by the principal. *Id* at 53-54. The court also observed that in the event of a claim, insureds have but one avenue to pursue payment, the insurer. *Id* at 54. Conversely, an obligee in a surety relationship has recourse against both the surety and the principal and "may contract with others in the marketplace to obtain completion of its construction project and thereafter recover the reasonable cost of completion against the principal and the surety." *Id* at 55.

The court also analyzed the inclusion of suretyship in the California Insurance Code but found its presence in the Code unconvincing.[10] *Id* at 47. Noting that "parties in a surety arrangement[] have certain rights and defenses that do not attend the typical insurance relationship[,]" the court concluded that the mere presence of suretyship in the Code was not determinative. *Id* at 52. Rather, the court found it "must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond." *Id*

*Texas*

Liberty Mutual also cites to a Texas Supreme Court case in support of its argument that South Dakota should join with other states in finding that a surety is not insurance and thus not subject to the tort of bad faith. In *Great Am. Ins. Co. v. N. Austin Mun. Util. District No. 1*, 908 S.W.2d 415 (Tex. 1995), Great American Insurance Company ("Great American") issued a bond in favor of the North Austin Municipal Utility District No. 1 ("MUD") for a wastewater construction project. *Id* at 416. After various conflicts arose, MUD sued Great American, among others, for breach of the duty of good faith and fair dealing. *Id* at 417-18. At trial, a jury

---

[10] The court noted that one text in the surety field observed that "[t]he inclusion of suretyship in the Insurance Code is derived from the need for control of the surety business by a state agency and does not imply that the underlying natures of insurance and suretyship are the same." *Id* at 50.

found that Great American had breached its duty and awarded MUD damages. *Id* at 418. The court of appeals affirmed. *Id* On appeal to the Texas Supreme Court, Great American argued that "the contractual relationship between a commercial surety and its bond obligee does not give rise to a common law duty of good faith and fair dealing." *Id*

The Texas Supreme Court found that while Great American was liable under the bond, "as a surety, Great American ha[d] no common law duty of good faith and fair dealing and that the Insurance Code [wa]s inapplicable . . . ." *Id* at 428. In so holding, the court found that none of the factors which created the special relationship between an insurer and insured—"unequal bargaining power, the nature of the insurance contracts, and the insurance company's exclusive control over the claim evaluation process"—were present. *Id* at 418. Further, similar to the court in *Cates*, the *Great American* court explained the differences between an insurance contract and a surety bond

> While a liability insurance contract involves only two parties, the insurer and the insured, suretyship involves a tripartite relationship between a surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation of the principal owed to the bond obligee. Unlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of a surety to a bond obligee is secondary to the obligation owed by its principal. A party sustaining a loss covered under a liability insurance contract can look only to its insurer for recourse. A bond obligee has a remedy against its principal

*Id* at 418-19 (citations omitted).

Lastly, the court noted that although some jurisdictions have imposed a duty based generally on the inclusion of suretyship in state insurance codes, it found that the "differences between suretyship and insurance merit consideration[ ]." *Id* at 420. Thus, similar to *Cates*, analyses of the various policy considerations were more persuasive than the mere presence of "surety" in the Code. *Id*, *see also Cates*, 21 Cal. 4th at 52 (explaining that "[we] must evaluate whether the policy considerations recognized in the common law support the availability of tort remedies in the context of a performance bond.")

9

*Pennsylvania*

Liberty Mutual also cites a 2009 federal district court opinion from the Middle District of Pennsylvania in support of its motion. In *U S ex rel SimplexGrinnel, LP v Aegis Ins Co*, 2009 WL 90233 (M D Pa Jan 14, 2009), Coleman Construction Company, Inc, ("Coleman") entered into a contract with the U S Navy for renovation of a fire alarm system. *Id* at *1 Coleman subcontracted with SimplexGrinnel, LP ("SG") to provide labor and materials. *Id* Aegis Security Company ("Aegis") issued the bond for the project. *Id* Conflicts arose between the parties and SG filed a claim with Aegis for compensation for work performed. *Id* Aegis did not tender payment under the bond. *Id* SG sued Aegis for bad faith under Pennsylvania's bad faith statute. *Id* Aegis filed a motion to dismiss under Rule 12(b)(6) arguing that a surety bond does not constitute insurance under Pennsylvania law. *Id*

In its opinion, the court noted that no statutory or common law authority existed in Pennsylvania on whether a surety bond constituted an insurance policy. *Id* at *3 Citing the "identifiable trend [] toward finding that a surety bond does not constitute an insurance policy," the court analyzed the distinctions between contracts of insurance and surety agreements.

The role of the surety is different from that of an insurer because

1 The surety bond is a financial credit product, not an insurance (indemnity) product,

2 The surety has a "contractual" relationship with two parties that often have conflicting interests, causing the surety to balance these interests when responding to claims,

3 The surety bond form customarily is written or furnished by the obligee rather than the surety

4 The surety customarily is requested to assure performance of construction contracts that are sufficiently large to warrant bonding and typically are entered into by parties with commercial sophistication, relative parity of bargaining power and access to ample legal and technical advice,

5 The bond premium usually is paid by the contractor to the surety out of the contract price, rather than directly by the obligee to the surety, although it is not uncommon for obligees to reimburse contractors for the premium, and

6  The pricing of the premium by the surety is not based upon risk of fortuitous loss, but assumes reimbursement to the surety from the principal and indemnitors for any loss

*Id* (quoting Philip L Bruner & Patrick J O'Connor, 4 Bruner & O'Connor on Construction Law § 12 7 (2003))  Based on these differences, the court declined to "judicially expand[] the bad faith statute to encompass surety bonds[]" and granted Aegis' motion to dismiss  *Id* at *5

### Other

Other jurisdictions that have addressed the issue presented in this motion include  Nevada and North Carolina [11]

Jurisdictions Recognizing a Bad Faith Claim in a Surety Context

In its response brief, Double H argues that a surety bond is insurance under South Dakota law and therefore subject to a bad faith cause of action  Doc 34 at 11  Along with its statutory arguments, which will be addressed *infra*, Double H cites various South Dakota cases in support of its argument  This Court, however, finds these cases unpersuasive  As previously noted, it has not been determined whether under South Dakota law a surety bond is subject to a bad faith cause of action  Therefore, Double H's attempt to liken the South Dakota Supreme Court's treatment of a worker's compensation claim or a statute of limitations controversy to the present issue is misplaced  Doc 34 at 16 (citing *Champion v U S Fid & Guar Co*, 399 N W 2d 320 (S D 1987)), Doc 34 at 17 (citing *Sheehan v Morris Irrigation*, 410 N W 2d 569 (S D 1987))  More persuasive to this Court is Double H's reference to various cases that have analyzed, and subsequently allowed, the remedy that Double H seeks

### Arizona

In *Dodge v Fid & Deposit Co of Md*, 778 P 2d 1240 (Ariz 1989) (In Banc), Mr and Mrs Dodge ("Dodge") contracted with Homes & Son Construction Company, Inc ("Homes") to build a residence  *Id* at 1241  Under the provisions of the contract, Homes obtained a performance bond with Fidelity and Deposit Company of Maryland ("Fidelity")  *Id* Thereinafter, conflicts arose between Dodge and Homes  *Id*  Dodge subsequently made a demand on Fidelity  *Id*  Fidelity refused to pay the claim  *Id*  Dodge sued Fidelity for breach of

---

[11] Great Am Ins Co v Gen Builders, Inc , 934 P 2d 257 (Nev 1997), Transylvania Cty v Lincoln Gen Ins Co , 2005 U S Dist LEXIS 44472 (W D N C Sept 29, 2005)

contract and for bad faith   *Id*   The trial court dismissed the bad faith claim and the court of appeals affirmed the dismissal, stating "'[G]iven the difference in the relationship created by casualty insurance and surety insurance, we see no compelling public policy reasons to expand the damages collectible against a surety beyond those traditionally provided for breach of contract'"   *Id*   (quoting *Dodge v Fid & Deposit Co*, 778 P 2d 1236, 1239 (Ariz Ct App 1986))

On appeal to the Supreme Court of Arizona,[12] the court first noted that prior case law established that Arizona recognized a tort in an insurance context   *Id*   (explaining that "[w]e have determined that it is reasonable to conclude that there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and a violation of that duty of good faith is a tort")   The court next analyzed the various statutes in its Insurance Code and concluded that "[o]ur statutes make clear our legislature's intent to include sureties within the coverage of the insurance statutes"   *Id* at 1242   Particularly the court noted the presence of "Surety Insurance" within the "Kinds of Insurance" listed under the Code   *Id*   The court further provided two additional bases for its reasoning   *Id*   First, it held that the surety bond was not obtained for profit or commercial advantage but to provide security and protection in the event of a default   *Id*   Secondly, it found that imposing tort damages on a surety who refused to pay a valid claim would deter such conduct   *Id*   (explaining that "[p]ermitting a surety to withhold performance of its obligations without reason would defeat the purpose for which surety insurance is intended")

*Colorado*

In *Transamerica Premier Ins Co v Brighton School Dist 27 J*, 940 P 2d 348 (Colo 1997) (En Banc), the Supreme Court of Colorado recognized the existence of a common law tort claim against a commercial surety who fails to reasonably proceed with payment of a claim under a performance bond   *Id* at 353   The court first noted that the insurance statutes reflected an intent to include sureties in the regulatory scheme governing insurance   *Id* at 352   (noting that "[s]ection 10-1-102(8), 4A C R S (1994) defines the term 'insurer' as 'every person

---

[12] The question presented before the court, "Can a surety on a contractor's performance bond be liable for the tort of bad faith?" was a question of first impression in Arizona   *Id* at 1242

engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance '"')

Next, similar to the Arizona court in *Dodge*, the court found that "[a] special relationship exist[ed] between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured[]" in that an obligee, in obtaining a bond, is insuring itself against potential losses  *Id*  Further, the court noted that while an argument may be made that the relationship differs because the parties in a surety agreement are on equal footing in terms of the bargaining process, "it is the commercial surety who controls the ultimate decision of whether to pay claims made by the obligee under the terms of the surety bond " *Id* at 353  Lastly, citing to *Dodge*, the court relied upon a deterrence argument, stating that "contract damages do not compensate the obligee for the commercial surety's misconduct and have no deterrent effect to prevent such misconduct in the future "[13]

*North Dakota*

In *Szarkowski v  Reliance Ins  Co* , 404 N W 2d 502 (N D  1987), Szarkowski Trucking ("Szarkowski") subcontracted with Scherbenske Excavating, Inc  ("Scherbenske") to provide hauling services  *Id* at 503  Scherbenske obtained performance/payment bonds from Reliance Insurance Company ("Reliance")  *Id*  Thereinafter, conflicts arose and Szarkowski sued Reliance  *Id* at 504  In its complaint, Szarkowski alleged a tort asserting that Reliance acted "unreasonably and in bad faith withholding payment of the claim " *Id* at 505  The trial court determined that, as a matter of law, Szarkowski was not entitled to relief  *Id* at 503  The Supreme Court of North Dakota reversed  *Id* at 505  Noting that "[t]his court has recognized that a paid surety or bonding company is generally treated as an insurer rather than according to the strict law of suretyship[,]" the court held that Szarkowski "ha[d] raised a valid claim in tort which require[d] a trial on the merits " *Id*

---

[13] Dodge v  Fid  & Deposit Co  of Md , 778 P 2d 1240, 1242-43 (Ariz  1989) (In Banc)  The court in *Dodge* explained that contract damages,

> [O]ffer no motivation whatsoever for the insurer *not* to breach  If the only damages an insurer will have to pay upon a judgment of breach are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money, earning the higher rates of interest on the outside market, and hoping eventually to force the insured into a settlement for less than the policy amount

*Alaska*

In *Loyal Order of Moose, Lodge 1392 v Int'l Fid Ins Co* , 797 P 2d 622 (Alaska 1990), the Moose Lodge ("Lodge") contracted with Darling Enterprises ("Darling") for a new facility in Fairbanks   *Id*  at 623   Darling obtained a performance/payment bond with International Fidelity Insurance Company ("Fidelity") and named the Lodge as the obligee   *Id*   Various disputes arose during the construction process resulting in a suit by the Lodge against Fidelity for bad faith inaction on the performance bond   *Id*  at 626

On appeal to the Supreme Court of Alaska, the court noted that the initial question was "'[d]oes Alaska recognize the tort of bad faith in the principal and surety context of a commercial construction claim?'"  *Id*  at 626   The court concluded that "an implied covenant of good faith and fair dealing exist[ed] between a surety and its obligee on payment and performance bonds[,] [which] [wa]s based in part on *Nicholson* and in part upon the persuasive reasoning of the Supreme Court of Arizona in *Dodge v Fidelity & Deposit Co of Md* "  *Id* (citations omitted)   In *Nicholson*, the court had previously held that in the insured/insurer context a cause of action for tortious bad faith existed based on the "special relationship between the insured and insurer       "  *Id*  at 626-27 (*citing State Farm Fire & Casualty Co v Nicholson*, 777 P 2d 1152, 1156 (Alaska 1989))   The court also cited favorably to *Dodge*—"sureties are insurers, insurers are subject to bad faith tort liability, therefore sureties are subject to bad faith tort liability[]       [a]lthough simple, this proposition is supported by our statutes, case law and sound policy reasons[]"—and further focused on the relationship between a surety to its obligee, finding that "a surety may satisfy its duty of good faith to its obligee by acting reasonably in response to a claim by its obligee, and by acting promptly to remedy or perform the principal's duties where default is clear "  *Id*  at 627-28

*Other*

Other jurisdictions recognizing a tort claim for bad faith in the suretyship context include Delaware, Hawaii, Montana, Florida, and Ohio [14]

---

[14] *Int'l Fid Ins Co v Delmarva Sys Corp* , 2001 WL 541469, at *9 (Del Super Ct May 9, 2001), *Bd of Dirs Of Ass'n of Apartment Owners of Discovery Bay Condo v United Pac Ins Co* , 884 P 2d 1134 (Haw 1994), *K-W Indus, a Div of Associated Techs , Ltd v Nat'l Sur Corp* , 754 P 2d 502 (Mont 1988), *Dadeland Depot, Inc v St*

## ANALYSIS

<u>Contractual Bad Faith</u>

In Count II of its Second Amended Complaint, Double H filed a claim for both contractual and tortious bad faith   Doc 61 at 27   In every contract, there exists "an implied covenant of good faith and fair dealing which prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract "   *Garrett v BankWest, Inc* , 459 N W 2d 833, 841 (S D  1990)   "This implied covenant of good faith is a principle of contract law        " *Trouten*, 2001 SD 106, ¶ 30, 632 N W 2d at 862   "Conduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability "   *Kunkel v  United Sec  Ins  Co  of N J* , 168 N W 2d 723 (S D  1969) (explaining that "breach of duty may arise from a contractual relationship        [but] the gist of an action may be tortious ")

Any claims that Double H may have for breach of the common law contractual duty will arise under the payment bond, which Double H has already claimed in Count I of its Second Amended Complaint   Doc  61 at 25   Liberty Mutual does not dispute Double H's standing to file suit under the bond and recover appropriately   Doc 39 at 4   South Dakota law does not recognize an extra-*contractual* remedy for bad faith   The heading to Count II of the Second Amended Complaint is "Count II—Contractual and Tortious Bad Faith "   Doc  61 at 27   To the extent that Count II attempts to allege contractual bad faith, that claim is dismissed

<u>Tortious Bad Faith</u>

The cases above reflect strong contrary opinions concerning whether suretyship is a type of insurance and thus subject to liability for tortious bad faith   Based on the presence of surety in the South Dakota Insurance Code and the policy considerations and the reasoning of other courts, this Court holds that a bad faith claim can be, and is, stated in Count II

---

Paul Fire and Marine Ins  Co , 945 So 2d 1216 (Fla  2006), Suver v  Personal Serv  Ins  Co , 462 N E 2d 415 (Ohio 1984)

*South Dakota Insurance Code*

The terms "surety" and "surety insurance" both appear in the South Dakota Insurance Code  SDCL § 58-1-1 ("This title shall be known as the Insurance Code "), SDCL § 58-1-2(10) ("'Insurer,' every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance,"), SDCL § 58-9-31 ("'Surety insurance' includes insurance guaranteeing the performance of contracts, other than insurance policies, and guaranteeing and executing bonds, undertakings, and contracts of suretyship "), SDCL § 58-21 ("Surety Insurance")  While this Court recognizes that "[t]he headings of portions of a statute, such as articles, chapters and section may not be used to extend or restrict the language contained in a statute [,]" *Deckert v Burns*, 62 N W 2d 879, 881 (S D  1954), the Court will not disregard the clear presence of surety provisions within the insurance statutes  Similar to the *Dodge* and *Transamerica* courts, *supra*, that found the inclusion of sureties within its states insurance statutes as a basis for its findings, this Court too finds the presence of sureties within the South Dakota Insurance Code to be reflective of the Legislature's intent to include sureties under the umbrella of insurance  *See Dodge*, 778 P 2d at 1242 (explaining that "[o]ur statutes thus make clear our legislature's intent to include sureties within the coverage of the insurance statutes "), *see Transamerica*, 940 P 2d at 352 (noting that "[s]ection 10-1-102(8), 4A C R S  (1994) defines the term 'insurer' as 'every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance '")  Further, South Dakota's definition of "insurer" is nearly identical to the definition of "insurer" cited in *Transamerica* [15]  Additionally, in *Tracy v T & B Const Co* , 182 N W 2d 320 (S D  1970), which is a factually dissimilar case, the South Dakota Supreme Court had the opportunity to analyze the South Dakota Insurance Code, particularly SDCL 58-1-2(10) ("Insurer") and SDCL 58-9-31 ("Surety Insurance"), and stated that

> [i]n our opinion the legislature clearly and unequivocally by the foregoing statutes defined a[]    surety as an insurer and placed them within the purview of SDCL 58-12-3, which reads 'In all actions    against any insurance company    on any policy or certificate of any type of insurance         '

---

[15] C R S A  § 10-1-102(8), now codified at C R S A  § 10-1-102(13), defines "Insurer" as, "every person engaged as principal, indemnitor, surety, or contractor in the business of making contracts of insurance "  Similarly, SDCL § 58-1-2(10) defines "Insurer" as, "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance "

*Id* at 323

Conversely, Liberty Mutual argues that "[t]here is simply no statutory or other authority for this proposition that Liberty is subject to South Dakota's common law of bad faith." Doc 39 at 3   In support of its argument, Liberty Mutual cites to the South Dakota Supreme Court's opinion in *Sheehan v United Pac Ins Co*, 439 N W 2d 117 (S D 1989) and *Cates, supra* *Sheehan* is inapplicable   In *Sheehan*, the Court addressed dissimilar issues and also noted that,

> this case has now come before this court on two occasions   Neither appeal has dealt with the merits of Sheehan's claim under the surety bond, which was provided for the performance of labor and installation of materials under Phase I and II of the contract between Sheehan and Johnson Bros Company and Morris Irrigation, Inc , a joint venture

*Id* at 119 [16]   Without any attempt by Liberty Mutual to further explain or compare *Sheehan* to the present case, it simply cites to the last sentence of the last paragraph of the opinion, which states, "This court agrees that surety bonds differ in their purpose from insurance contracts providing coverage for general liability claims, as urged by the appellee." *Id* at 119   That statement has nothing to do with the holding and thus is dicta and unpersuasive to this Court

Liberty Mutual also cites to *Cates* for the proposition that the mere inclusion of surety in the insurance code did not require its classification as insurance for all purposes   Doc 32 at 11 This, without more, is again unpersuasive   As previously noted, numerous courts have held that the inclusion of surety in a state's insurance code was persuasive in finding a surety to be included as insurance and thus subject to a tortious bad faith claim   Further, there is no basis to find that the legislature only included "surety" or "surety insurance" in the South Dakota Insurance Code to simply allow for regulatory supervision or limited application in the insurance context   *See Cates*, 21 Cal 4th at 50 (noting that "'[t]he inclusion of suretyship in the Insurance Code is derived from the need for control of the surety business by a state agency and does not imply that the underlying natures of insurance and suretyship are the same '")

---

[16] Two years prior to its decision, the Court also ruled on Sheehan v Morris Irr , 410 N W 2d 569 (S D 1987) (*Sheehan I*)   In *Sheehan I*, the Court addressed whether a surety could shorten a statute of limitations otherwise allowed under South Dakota law   *Id* at 570   The Court held that the two-year limitation period in United Pacific's bond was void   *Id* at 571

*Policy Considerations*

The inclusion of surety in the South Dakota Insurance Code is persuasive but not the only consideration. This Court finds additional support for its holding from *Dodge, supra*. The Court agrees with the reasoning in *Dodge* in that the purpose of a construction payment/performance bond is not for commercial advantage but rather to provide security and protection in the event of a defaulting principal, similar to the purpose of insurance. Pursuant to SDCL § 56-2-1, a suretyship is defined as "a contract by which one who at the request of another and for the *purpose of securing to him a benefit* becomes responsible for the performance by the latter of some act in favor of a third party or hypothecates property as security therefor." (emphasis added). Similarly, under SDCL § 58-1-2(8), insurance is defined as "a contract whereby one undertakes *to indemnify another or to pay or provide a specified or determinable amount or benefit* upon determinable contingencies." (emphasis added). "To allow the surety to purposefully delay or intentionally manipulate payment to their benefit would undermine the primary purpose of insulating the obligee from the risk of default." *Int'l Fid Ins Co v Delmarva Sys Corp*, 2001 WL 541469, at *9 (Del Super Ct May 9, 2001). Furthermore, *Dodge* also supports this Court's belief that by imposing tort damages on a surety who refuses to reasonably investigate and pay a valid claim would function as a deterrent. Unlike the *Cates* court, this Court does not believe that harmful economic repercussions will result if claimants are allowed to bring a bad faith cause of action against a surety. Instead, this Court finds that the availability of a bad faith claim against a surety will act as a type of "check" that is a reasonable means to deter bad faith handling of legitimate claims. The fact that a bad faith claim can be made does not mean the claim will proceed beyond summary judgment to trial.

Additionally, while the Court is cognizant of the differences between a surety relationship and an insurer/insured relationship, it does not believe that the differences warrant total denial of a tort remedy against a surety for breach of a bond. The Court instead finds that there is a special relationship between a surety and obligee, similar to that of an insurer and its insured in that an obligee too relies on a surety to guarantee performance and/or payment in the event of a default. The Court finds support from *Transamerica, supra*. In *Transamerica*, the Supreme Court of Colorado stated

A special relationship exists between a commercial surety and an obligee that is nearly identical to that involving an insurer and an insured   When an obligee requests that a principal obtain a commercial surety bond to guarantee the principal's performance, the obligee is essentially insuring itself from the potentially catastrophic losses that would result in the event the principal defaults on its original obligation   When the principal actually defaults, the commercial surety must assume or correct any flaws in performance pursuant to the terms of the original contract, thereby eliminating the obligee's risk of loss in the venture

*Transamerica*, 940 P2d at 352

## CONCLUSION

South Dakota courts have long held that a bad faith cause of action exists in the insurance context   The question presented to this Court was whether suretyship was subject to bad faith liability for an alleged breach of a payment bond   Based upon an analysis of the South Dakota Insurance Code, the nature of surety instruments, other policy considerations previously discussed, and an analysis of fellow jurisdictions that had addressed the issue, this Court finds that suretyship is a type of insurance and thus Double H is allowed to proceed on its tortious bad faith claim

IT IS ORDERED that Defendant's Motion to Dismiss Count II of Plaintiff's Second Amended Complaint, Doc  32

1   Is denied with regard to Plaintiff's claim for tortious bad faith, and
2   Is granted insofar as Plaintiff attempts to state a claim in Count II for contractual bad faith, and any such claim is dismissed

Dated this 30 day of September, 2016

BY THE COURT

Lawrence L  Piersol
United States District Judge

ATTEST
JOSEPH HAAS, Clerk of Courts
By _____, Deputy
(SEAL)